**JUDICIAL WATCH, INC. Plaintiff,**

v.

**EXPORT–IMPORT BANK, Defendant.**

**No. C.A. 99–1693(RCL).**

United States District Court, District of Columbia.

Aug. 9, 2000.

---

22

Larry Klayman, Judicial Watch, Inc., Washington, D.C., for Plaintiff or Petitioner.

Scott S. Harris, Assistant United States Attorney, Washington, D.C., for Defendant or Respondent.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This matter comes before the Court on defendant Export–Import Bank's ("the Bank") motion for summary judgment and plaintiff Judicial Watch's cross-motion for summary judgment. For the following reasons, defendant's motion is granted in part and denied in part, and plaintiff's motion is granted in part and denied in part.

## BACKGROUND

### I. Facts

On May 22, 1999, Judicial Watch submitted a Freedom of Information Act ("FOIA") request to the Bank. The Bank received Judicial Watch's five-part request on May 25, 1999. Judicial Watch sought records pertaining to 1) "the application, analysis, consideration, and/or granting of export insurance for goods and services considered for exportation and/or exported to the People's Republic of China from January 20, 1993 to the present"; 2)(a) "the appointment of James Harmon and Maria Haley to the Export–Import Bank," and (b) "their contact with companies, entities, and/or persons related or doing or conducting business in any way with the People's Republic of China"; 3) "contact and/or communication by James Harmon and/or Maria Haley with the government officials and/or agents of the People's Re-

public of China"; 4) "contact and/or communication by James Harmon and/or Maria Haley with Tony Coehlo"; and 5) "Tony Coehlo and/or Wertheim–Schroeder." Complaint, at ¶ 5.

According to Judicial Watch, it had neither received a response to its request within twenty working days nor a statement from the Bank articulating the reason for the delay, as required by 5 U.S.C. § 552(a)(6)(A)(i) and 5 U.S.C. § 552(a)(6)(B)(i)-(iii). The Bank, however, wrote Judicial Watch on July 21, 1999, explaining that the delay resulted from Judicial Watch's lack of cooperation. Specifically, Judicial Watch had agreed during a June 4, 1999 telephone conversation to clarify the request, but never called the Bank back to do so. In addition, the Bank called Judicial Watch several more times and left messages (on June 9, 11, and 16, 1999) which were not returned. Nevertheless, Judicial Watch determined that it had exhausted its administrative remedies and filed this lawsuit on June 24, 1999, to compel disclosure.

Pursuant to the FOIA, the Bank conducted a search for responsive records and made disclosures to the plaintiff. The disclosure occurred in three phases. First, on September 2, 1999, the Bank released 335 pages of documents, either in redacted form or their entirety, responsive to parts 2 through 5 of the request. The Bank also referred 35 responsive documents to the Department of Commerce for review and direct response to Judicial Watch. Second, on September 20, 1999, the Bank released 50 pages from Director Haley's telephone logs, which were responsive to parts 2 through 5 of the request. Third, on December 15, 1999, the Bank released 16,683 pages, either in redacted form or in their entirety, responsive to part one of the request. The Bank, however, withheld seven binders of documents, totaling 2,113 pages, and 137 insurance applications that were either withdrawn or denied by the Bank.

## II. The Export–Import Bank

To evaluate the legal issues in this FOIA suit, the following background information pertaining to the Bank is useful. The Bank is an agency of the United States government. Its purpose is to aid in financing and facilitating exports and the exchange of goods and services between the United States and foreign countries. 12 U.S.C. § 635(a)(1). The Bank is founded on the premise that it is in the United States' interest to "foster expansion of manufactured goods, agricultural products, and other goods and services, thereby contributing to the promotion and maintenance of high levels of employment and real income and to the increased development of the productive resources of the United States". 12 U.S.C. § 635a(b) and (c). To achieve this goal, the Bank is authorized to provide guarantees, insurance, and extensions of credit on competitive terms to United States businesses that seek to export goods and services to other countries, particularly where private financing and insurance is unavailable because of risk factors specific to the country importing those goods. *Id.; see also* Declaration of Joseph A. Sorbera ("Sorbera Decl."), App. A, at 2. Governance of the Bank is by a five-member Board of Directors, all of whom are appointed by the President with the approval of the U.S. Senate. 12 U.S.C. § 635a(b) and (c).

## ANALYSIS

In light of this background, the Court must dispose of two legal issues. First, whether the Bank's search for responsive records was adequate. Second, whether the Bank properly withheld information from Judicial Watch and segregated nonexempt information for disclosure.

### I. The Freedom of Information Act

The FOIA, 5 U.S.C. § 552 (1994 & Supp. II 1996), stipulates that any person has a right of access to federal agency records, except for those records protected from disclosure by one of nine exemptions.

The purpose of the FOIA is "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire and Rubber Co.*, 437 U.S. 214, 242, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978).

■ When an agency withholds requested information, it must demonstrate that the information is exempt from disclosure. 5 U.S.C. § 552(a)(4)(B). Accordingly, the agency submits an index to the court which must adequately describe the withheld information and explain the relevance of each exemption. *Founding Church of Scientology v. Bell*, 603 F.2d 945, 946 (D.C.Cir.1979); *Vaughn v. Rosen*, 484 F.2d 820, 827 (D.C.Cir.1973). Further, "[i]f a document contains exempt information, the agency must still release 'any reasonably segregable portion' after deletion of the nondisclosable portions." *Oglesby v. United States Dep't of the Army*, 79 F.3d 1172, 1176 (D.C.Cir.1996)(citing 5 U.S.C. § 552(b)). To ensure that all reasonably segregable information has been disclosed to the requester, the district court is required to enter a finding on segregability. *Trans–Pacific Policing Agreement v. United States Customs Serv.*, 177 F.3d 1022, 1028 (D.C.Cir.1999). Even if the issue of segregability has not been raised by the plaintiff, the district court has "an affirmative duty to consider the segregability issue sua sponte." *Id.*

FOIA litigation is typically adjudicated through summary judgment. Summary judgment is appropriate when the pleadings, together with any affidavits, "show that there is no genuine issue as to any material facts and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Alyeska Pipeline Serv. Co. v. U.S. EPA*, 856 F.2d 309, 313 (D.C.Cir.1988).

■ In FOIA litigation, the standard of review in the district court is *de novo*, and the agency bears the burden of justifying the withholdings. 5 U.S.C. § 552(a)(4)(B); *Department of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 755, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989). To meet its burden of proof, the agency may submit affidavits from their officials. *Hayden v. NSA*, 608 F.2d 1381, 1386 (1979). The affidavits "must show, with reasonable specificity, why the documents fall within the exemption." *Id.* at 1387. Once a court determines that the affidavits are sufficient, no further inquiry into their veracity is required.

■ Summary judgment is appropriate in the instant case because there are no genuine issues of material fact and the legal issues can be resolved based on the pleadings and affidavits. Although Judicial Watch argues for discovery on the adequacy of the Bank's search for responsive documents, discovery in a FOIA action is "generally inappropriate." *Center for Nat'l Sec. Studies v. Office of Indep. Counsel*, No. 91–1691, slip op. at 3 (D.D.C. Mar. 2, 1993). Discovery may be appropriate when the plaintiff can raise sufficient question as to the agency's good faith in processing or in its search. *See, e.g., Carney v. United States Dep't of Justice*, 19 F.3d 807, 812 (2d Cir.1994). Judicial Watch has not alleged, much less raised sufficient question, that the Bank acted in bad faith regarding this FOIA request. Further, Judicial Watch's allegation that Bank officials acted improperly by assisting individuals in export matters in exchange for campaign contributions is irrelevant to resolving this FOIA action.

II. Adequacy of the Search

■ An agency will be granted summary judgment on the adequacy of the search if it has demonstrated that it has conducted a "search reasonably calculated to uncover all relevant documents." *Weisberg v. U.S. Department of Justice*, 705 F.2d 1344, 1350–51 (D.C.Cir.1983) (*"Weisberg I"*). Accordingly, "[t]he adequacy of the search . . . is judged by a standard of

reasonableness and depends, not surprisingly, on the facts of each case." *Weisberg v. U.S. Department of Justice,* 745 F.2d 1476, 1485 (D.C.Cir.1984) (*"Weisberg II"*). To meet its burden of proving that no genuine issue of material fact exists, "the agency may rely on reasonably detailed, nonconclusory affidavits submitted in good faith." *Id.* (citing *Weisberg I,* 705 F.2d at 1350–51).

Judicial Watch does not challenge the adequacy of the Bank's search with respect to parts 1, 2(a), 3, 4 and 5 of the request. Judicial Watch, however, argues that the Bank's search for records responsive to part (2)(b) of the request was inadequate because the Bank failed to conduct any search at all.

### A. The Bank's Record Systems

The Bank maintains several record systems, both electronic and manual, for recording and storing data and documents related to transactions processed by the Bank. The Bank has five electronic recordkeeping systems. The electronic systems store and track information such as the names of participants in the Bank's programs, financial information, application status, and product information. In addition, hard copy documents received by the Bank are maintained in a separate system of records and are organized by category. The Bank makes microfiche copies of these documents to use for any subsequent data retrieval.

### B. The Scope of the Search

#### 1. Part 1

Part 1 of the request sought all records pertaining to the application, analysis, consideration, and/or granting of export insurance for goods and services considered for exportation and/or exported to the People's Republic of China from January 20, 1993 to the present. The Bank's search of its electronic record systems revealed 395 files responsive to this part of the request. The Bank collected the corresponding microfiche and hired a private contractor to make hard copies of the documents, which totaled approximately 19,000 pages. The Bank also hired a temporary paralegal and two temporary clerical staff to assist the Bank's staff in reviewing the documents.

#### 2. Part 2(a)

This part of the request, as noted above, seeks records pertaining to the appointment of James Harmon and Maria Haley to the Bank. Staff in the Bank's Office of Human Resources gathered responsive documents housed in that office. In addition, a contract attorney in the Office of General Counsel reviewed all files in that division relating to the appointment of Chairman Harmon. On September 2, 1999, the Bank provided Judicial Watch all releasable documents responsive to this part of the request.

#### 3. Part 2(b)

This part of the request sought all records pertaining to contacts between Mr. Harmon or Ms. Haley and "companies, entities, and/or persons related or doing or conducting business in any way with the People's Republic of China." The Bank found this portion of the request to be unreasonably broad because "almost every major corporation in the United States, many of which are Ex–Im Bank customers, has some business dealings" with China. *See* Def.'s Mot. for Summ. J., Ex. A, at 2. In addition, the Bank contacted Judicial Watch several times to clarify this part of the request, but Judicial Watch failed to return the Bank's telephone calls. *Id.* Accordingly, the Bank did not conduct any search for records responsive to part 2(b).

#### 4. Parts 3, 4, and 5

Parts 3, 4, and 5 of the request seek records pertaining to contacts between Mr. Harmon and Ms. Haley and 1) the government of China or 2) Tony Coehlo, and all other records pertaining to Mr. Coehlo and/or Wertheim Schroder & Co. These

types of records would not be located in the Bank's automated record systems, but rather in files throughout the Bank. Accordingly, the FOIA staff contacted offices and individuals that might reasonably have responsive records. The FOIA staff asked these offices and individuals to search their files, including phone logs and calendars, for responsive documents. The individuals contacted included Chairman Harmon, Director Haley, their administrative assistants, the Chief of Staff, the Vice President and Counselor to the President and Chairman, and special assistants. The offices contacted included Congressional Affairs, Communications, General Counsel and two lending divisions. Further, as agreed between the Bank and Judicial Watch on June 4, 1999, the Bank searched an electronic database for any transactions relating to Wertheim Schroder & Co., Inc. No responsive records were found.

## C. Findings on Adequacy of the Search

### 1. Parts 1, 2(a), 3, 4 and 5

■ Judicial Watch did not challenge the adequacy of the Bank's search with respect to these parts of the request. For the following reasons, the Court finds that the Bank conducted an adequate search with respect to parts 1,2(a), 3, 4, and 5. First, the Bank has the burden to establish that it has conducted a search reasonably calculated to uncover all responsive records. *Weisberg II*, 745 F.2d at 1485. An agency can submit affidavits to establish the reasonableness of its search and thereby meet its burden. *Id.* The affidavits must be relatively detailed, non-conclusory and made in good faith. *Id.* The Bank has provided the Court with the Sorbera Declaration to demonstrate the adequacy of its search. As noted above, this declaration explains in detail how the Bank searched for records responsive to parts 1, 2(a), 3, 4 and 5 of the request. The declaration demonstrates that the searches of the electronic record-keeping systems and the hard copies of documents were thorough. In addition, the declaration explains that

the FOIA staff directed specific persons and offices to search their files for responsive records.

### 2. Part 2(b)

■ Judicial Watch challenges the adequacy of the search for documents responsive to part 2(b) because the Bank did not conduct any search at all. The Bank responds that this part of the request is unreasonably broad. The Bank also argues that despite its repeated attempts to resolve this issue, Judicial Watch did not cooperate.

■ Although the Bank did not conduct any search with respect to part 2(b) of the request, it does not necessarily follow that the search was inadequate. FOIA requires that a request "reasonably describe" the records sought. *See* 5 U.S.C § 552(a)(3)(A). A description of the requested documents is adequate if it enables a professional agency employee familiar with the subject area to locate the record with a reasonable amount of effort. *See* H.R.Rep. No. 930876, at 6 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6267, 6271. Further, a request can be inadequate if it imposes an unreasonable burden. *AFGE v. U.S. Department of Commerce*, 907 F.2d 203, 209 (D.C.Cir.1990). Accordingly,

> it is the requester's responsibility to frame requests with sufficient particularity to ensure that searches are not unreasonably burdensome ... The rationale for this rule is that FOIA was not intended to reduce government agencies to full-time investigators on behalf of requesters. Therefore, agencies are not required to perform searches which are not compatible with their own document retrieval systems.

*Assassination Archives and Research Ctr. v. CIA*, 720 F.Supp. 217, 219 (D.D.C.1989) (internal citations omitted). Part 2(b) of the request does not reasonably describe the records sought. It is unreasonably broad and imposes an unreasonable burden on the Bank. Not only did Judicial

Watch fail to state its request with sufficient particularity, it also declined the Bank's repeated attempts clarify the request. The FOIA does not require the Bank to investigate which companies having contacts with Mr. Harmon or Ms. Haley may have had dealings with China and to locate all documents relating to contacts between Mr. Harmon or Ms. Haley and those companies. The Bank acted properly with respect to part 2(b) of the request.

## III. Exemption 4

Exemption 4 of FOIA protects from disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). This case concerns the second part of the exemption, which protects confidential commercial or financial information, as opposed to trade secrets. This type of information is protected from disclosure if it is 1) commercial or financial, 2) obtained from a person, and 3) privileged or confidential. *National Parks and Conservation Ass'n v. Morton*, 498 F.2d 765, 766 (D.C.Cir.1974). These three requirements are discussed below and applied to the information the Bank is withholding.

### A. Commercial and Financial Information

In the context of Exemption 4, the terms "commercial" and "financial" should be given their ordinary meanings. *Public Citizen Health Research Group v. Food and Drug Admin.*, 704 F.2d 1280, 1290 (D.C.Cir.1983) (citing *Washington Post Co. v. U.S. Department of Health & Human Services*, 690 F.2d 252, 266 (D.C.Cir.1982), and *Board of Trade v. Commodity Futures Trading Comm'n*, 627 F.2d 392, 403 (D.C.Cir.1980)). Further, the exemption applies where the submitter has a "commercial interest" in the information. *Public Citizen*, 704 F.2d at 1290. The D.C. Circuit has also held that these terms should not be limited to records that "reveal basic commercial operations." *Id.*

The information being protected under Exemption 4 is "commercial or financial." As explained below, the withheld information concerns the insurance applicant's financial status and/or export plans. *See* Sorbera Decl.App. B, at 2–8; App. C, at 2–3; and App. D, at 3.

### B. Obtained from a Person

Second, the term "person" in the context of Exemption 4 applies to a wide range of entities, including corporations, associations and public or private organizations. *See, e.g., Allnet Communication Services, Inc. v. Federal Communications Commission*, 800 F.Supp. 984, 988 (D.D.C.1992), *aff'd*, No. 92–5351 (D.C.Cir. May 27, 1994). The only type of entity that is not a considered a "person" under Exemption 4 is an agency of the federal government. *See Federal Open Market Committee v. Merrill*, 443 U.S. 340, 360, 99 S.Ct. 2800, 61 L.Ed.2d 587 (1979). However, documents prepared by the federal government may be covered by Exemption 4 if they contain summaries or reformulations of information supplied by a source outside of the government. *See Gulf & Western Indus. v. United States*, 615 F.2d 527, 529–30 (D.C.Cir.1979).

The information being withheld has been obtained from a "person", as that term applies to Exemption 4. The Bank obtained the information from the insurance applicants themselves, commercial lenders for the applicant, or a purchaser of the goods at issue. Each of these entities is a "person" within the meaning of Exemption 4.

### C. Confidential or Privileged Information

Third, when the government requires a private party to submit information as a condition of doing business with the government, as in this case, the information is "confidential or privileged" under Exemption 4 if one of several requirements is met. *See Critical Mass Energy Project v. Nuclear Regulatory Comm'n*,

975 F.2d 871 (D.C.Cir.1992), *cert. denied,* 507 U.S. 984, 113 S.Ct. 1579, 123 L.Ed.2d 147 (1993). These conditions include: 1) disclosure which is likely to cause substantial harm to the competitive position of the person from whom the information was obtained, *National Parks,* 498 F.2d at 770; *McDonnell Douglas Corp. v. 'National Aeronautics & Space Admin.,* 180 F.3d 303, 306 (D.C.Cir.1999); 2) disclosure which would make it difficult for the government to obtain reliable information in the future, *Critical Mass,* 975 F.2d at 878; and 3) withholding the information to protect a governmental interest in administrative efficiency and effectiveness, *see National Parks,* 498 F.2d at 770 n. 17; *9 to 5 Organization for Women Office Workers v. Board of Governors of Fed. Reserve Sys.,* 721 F.2d 1 (1st Cir.1983). Each of these conditions is discussed in detail below.

1. Substantial Competitive Harm

 Information can be withheld under Exemption 4 not only when actual competitive harm is established, but also when the government presents evidence of "actual competition and a likelihood of substantial competitive injury." *CNA Fin. Corp. v. Donovan,* 830 F.2d 1132, 1152 (D.C.Cir.1987).

Here, the Bank properly invokes Exemption 4 because disclosure of the information could cause substantial harm to the competitive position of the company or person from whom the information was obtained. When an applicant has submitted its export insurance application to the Bank, the requested transaction is in a highly competitive state. Other U.S. exporters and foreign competitors may be competing simultaneously for the same transaction or project. Thus, financial and technical details of the proposed transaction are confidential, and, if released, could harm the submitter's commercial interests.

The types of information being withheld could enable a competitor to obtain an unfair advantage if it had such information prior to the applicant having its insurance policy approved. Even years after the policy is approved, the information could still harm the exporter if it is an ongoing transaction or if the same exporter is competing for insurance currently for new transactions for the same or similar products to the same part of the world. Likewise, the information could be used by someone with a knowledge of how the Bank computes its premiums to determine the dollar amount of the insured's overall transaction and/or individual shipments.

Exemption 4 also protects the insured's future negotiating position. An insured's policy reflects understandings reached by the parties to the export transaction. The insured parties, exporters and banks, often agree to additions to or deletions from the Bank's standard export insurance policy. If sensitive information contained in a policy or its underlying documentation—e.g., when the insured has made a concession to the Bank—became publicly known, it could hinder the insured's ability to obtain future financing on favorable terms.

2. Disclosure Would Make it Difficult to Obtain Reliable Information in the Future

In addition to withholding information to prevent a substantial competitive harm, Exemption 4 can be invoked to withhold information submitted to a government agency where disclosure would impair the agency's ability to obtain information in the future. *See National Parks,* 498 F.2d at 770. Specifically, when information is required to be submitted, "the governmental impact inquiry will focus on the possible effect of disclosure on its quality." *Critical Mass,* 975 F.2d at 878.

The Bank treats commercial and financial information submitted by exporters under guaranteed loan, credit guarantee, and export insurance programs as confidential business information because public disclosure of such information might encourage exporters to be less forthcoming in their submissions, out of concern for

both appearances and their own financial interests.

The government has a compelling interest in ensuring that the information it receives is of the highest quality and reliability, and disclosure of potentially sensitive commercial and financial information, even where submissions of information are mandatory, would jeopardize the Bank's ability to rely on any such information that is submitted. A lack of reliability would cripple the Bank's ability to make rational decisions regarding the viability of future export insurance transactions, thereby hindering the Bank's ability to fulfill its statutory purpose.

> 3. Disclosure Would Impair the Bank's Ability to Fulfill Its Statutory Purpose

This Court has held that impairment of an agency's ability to carry out its statutory purpose is sufficient cause to justify a finding of confidentiality within the context of Exemption 4. *See Comstock International (U.S.A.), Inc. v. Export–Import Bank of the United States*, 464 F.Supp. 804 (D.D.C.1979); *M/A–Com Information Systems, Inc. v. U.S. HHS*, 656 F.Supp. 691 (D.D.C.1986). In *Comstock*, a FOIA requester sought disclosure of documents pertaining to an international loan made by the Bank. The Court held that commercial banks and borrowers were reluctant to negotiate loan agreements with the agency absent assurances of confidentiality, and therefore disclosure would interfere with the agency's ability to promote U.S. exports. *See Comstock*, 464 F.Supp. at 808. In *M/A–Com Information Systems*, a FOIA requester sought disclosure of information relating to settlement negotiations in a debarment action. This Court held that the information was protected under Exemption 4, noting it was in the public interest to encourage settlement negotiations in matters of this kind and it would have impaired the ability of the agency to carry out its governmental mandate if dis-

closure were required. *M/A–Com Information Systems*, 656 F.Supp. at 692.

Under this reasoning, withholding the information at issue here is justified. The Bank's function of providing insurance would be undermined if the information were made public. The Bank's FOIA-related regulations provide as follows with regard to commercial financial information provided to the Bank in confidence: "this subpart ... recognizes that the soundness of many Ex–Im Bank programs depends upon the receipt of reliable commercial, technical, financial, and business information relating to applicants for Ex–Im Bank assistance and that receipt of such information depends upon Ex–Im Bank's ability to hold such information in confidence." 12 C.F.R. § 404.1(b). The regulation defines "business information" as "potentially confidential commercial or financial information that is provided to Ex–Im Bank." 12 C.F.R. § 404.2.

Disclosure of the information that the Bank seeks to protect under Exemption 4 would impair its ability to fulfill its statutory purpose, which is to foster domestic economic growth by supporting United States export transactions that are too risky for private capital financing. *See* The Export Import Bank Act of 1945, as amended through P.L. 106–113, November 29, 1999. U.S. exporters compete in the world market with foreign companies whose exports are supported by foreign export credit agencies ("ECA"). These foreign ECA are not required to disclose financial information to outside parties. There is a risk that foreign purchasers may seek financing outside of the United States, and thus would purchase non-U.S. goods if subjected to the risk of disclosure of their confidential commercial or financial information. This would interfere with the Bank's ability to promote U.S. exports, and result in loss of business for U.S. exporters due to their inability to offer competitive financing terms to their foreign buyers in high-risk foreign markets.

### D. The Bank's Withholdings Under Exemption 4

#### 1. Part 1 of the Request: Documents Withheld in Part

The Bank uses a set of standardized forms in processing insurance applications and issuing insurance policies. This set of standardized forms contains 28 types of information that the Bank withheld under Exemption 4. Thus, the records responsive to Part 1 of the request were numerous versions of the standardized forms. Further, the information contained in the documents is numerous versions of the 28 types of information the Bank considers exempt. Accordingly, the Bank's *Vaughn* Index explains why each of the 28 types of information within the standardized forms are exempt, rather than explaining why each individual document is exempt.

Below is a sample of three of the 28 types of information the Bank seeks to withhold under Exemption 4 and the Bank's reasons for protecting each type of information. First, the Bank is withholding "descriptions of the products being shipped", because disclosure could enable a competitor to attempt to negotiate a competitive contract with the same buyer for the same goods. This occurrence could substantially harm the U.S. exporter's competitive position. Second, the Bank is withholding "the amount of the insurance premium being paid." The amount of the premium relates to the total dollar value being insured for each shipment, usually 90% to 95% of the value of the shipment. A competitor who is familiar with the way the Bank determines its premium rates, such as an exporter who does frequent business with the Bank, could deduce the shipment amount from the premium amount. This information, combined with the total quantity of goods specified for that shipment, would allow a competitor to determine the prices of the goods, which could enable the competition to offer a lower bid for the contract than that being offered by the insured. This could substantially harm the insured's competitive position. Third, the Bank is withholding bank account numbers. This information is considered confidential throughout the banking industry. Disclosure could result in efforts to fraudulently withdraw funds from the account.

#### 2. Part 1 of the Request: Documents Withheld in Full

█ The Bank withheld twelve types of documents in full under Exemption 4. The withheld documents relate to insurance policies that the Bank approved and issued. These documents are 1) contracts, 2) sales figures, 3) lists of customers, 4) financial statements, 5) credit reports, 6) audit analyses, 7) bad debt write-offs, 8) audits of financial statements, 9) letters to and from insurance brokers who represent the exporter, 10) advice of credits, 11) wire transfers of funds, and 12) political risk worksheets prepared by one of the outside parties to the transaction.

The Bank provided a description of each type of document and a separate index which lists each document by number. The descriptions of each type of document, together with the *in camera* inspection discussed below, satisfy the Court that the documents withheld in full under Exemption 4 contain no reasonably segregable information. The Bank is withholding the documents in full because disclosure could substantially harm the insured's competitive position. In addition, the only factual information in these documents is financial. Accordingly, the factual portions cannot be reasonably segregated from the rest of the document. Disclosure of the factual portions would amount to disclosure of Exemption 4 information. The following is a sample of the document descriptions provided by the Bank.

First, the "contracts" contain details about the terms of the sales, product prices, transaction financing, drawings, product designs and specifications, packing and shipping requirements, and other aspects of the exports transactions. These

types of information are traditionally regarded as confidential. Further, if such information were available to competitors, the submitter could suffer substantial competitive harm. To the extent these contracts contain design details, specifications for the products, or drawings of the products, those documents are considered trade secrets which the Bank is prohibited from disclosing under 18 U.S.C. § 1905.

Second, financial statements, credit reports, audits of financial statements, audit analyses, and bad debt write-offs contain detailed information about the company's credit status, accounts receivable, sales figures, profit and loss figures, net profit after taxes, value of inventory, and capital equipment. Such information is confidential financial information that the Bank requires the submitter to provide. It could be used by a competitor to create a competing bid for the same contract that both are seeking in a foreign country. This could substantially harm the insured's competitive position.

Third, lists of customers are confidential financial information. If a competitor had a list of the insured's customers, the competitor could contact those customers and attempt to lure them away from the insured by offering to sell the same goods at lower prices. This could substantially harm the insured's competitive position.

The only document description that did not satisfy the Court was the description of political risk worksheets. The Bank describes these documents as follows:

> Political Risk Worksheets are tables prepared by the U.S. exporter or U.S. bank that evaluate a company's export transaction risk in one or more foreign countries. This information is confidential because it contains the dollar amounts of a company's pending export transactions. Competitor could determine the overall value of each contract and in some cases the goods and quantities in various contracts and use that to attempt to underbid the U.S. exporter in the same or a similar transaction. This

could substantially harm the insured's competitive position.

The Court was uncertain from this description whether these documents contained any reasonably segregable information. The Court was also uncertain which documents on the numbered list were "political risk worksheets." Accordingly, by Order dated July 6, 2000, the Court requested the Bank to submit a list of all political risk worksheets. The Order indicated that a sampling would be selected from the list for *in camera* inspection. Because only two documents on the entire list were political risk worksheets, the Bank submitted both documents, instead of a list of the documents, for *in camera* inspection on July 11, 2000. Both documents are one page in length and pertain to a construction company's contract. The Court is satisfied that neither document contains any reasonably segregable information; all the information is financial in nature. Both documents were properly withheld in their entireties under Exemption 4.

In addition to the twelve types of documents described above, the Bank also withheld in their entirety 137 insurance applications that were withdrawn by the applicant or declined by the Bank. The Bank did not Bates stamp each document. Instead, the Bank provided a list of the 137 applications and a detailed explanation for why the applications were withheld in their entirety. *See* Sorbera Decl., App. C, at 7–9.

Once a policy has been approved and issued, the competition for that particular transaction is over, and it is not harmful to the applicant's competitive position to release most of the documents in the files, in redacted form with the financial information deleted. However, if an application has been withdrawn or declined, even a list of and description of the documents contained in the files could harm the applicant's competitive position.

At the application stage, a proposed transaction is in a highly competitive state. Other U.S. exporters and foreign competitors may be competing simultaneously for the same transaction or project. Unlike a procurement process, the competition to obtain contracts with foreign buyers has no specific ending date. Any applicant with the bank whose application is withdrawn or declined may continue to seek that contract through private export insurance or other avenues. The Bank has no way of knowing whether the exporter may be continuing to pursue that transaction. Financial and technical details of the proposed transaction, even the names of the proposed buyers, are extremely confidential, and if released could harm the submitter's competitive position. Both foreign buyers and competing exporters might be able to undercut the U.S. exporter's negotiating position by utilizing the released financial information.

In addition, because the competition among exporters for business is an ongoing process, often taking considerable time over a period of months or years, release of such information could affect a U.S. exporter's commercial interests long after its application to the Bank was withdrawn or denied.

An exporter whose application to the Bank is withdrawn or denied, and who may still be actively competing against other exporters and seeking export insurance elsewhere, is at a critical commercial juncture. To avoid a negative impact on the exporter's commercial position, the Bank must exercise a high degree of care in handling confidential financial information regarding such an exporter. Even the release of information regarding the types of information the Bank requires as part of its insurance application could serve to undercut a U.S. exporter's commercial position. Thus, the Bank properly treats all withdrawn or denied insurance applications, as well as descriptions of the contents of such applications, as exempt from disclosure under (b)(4).

In addition, this information should be withheld because its disclosure would make it difficult for the Bank to obtain reliable information in the future. The Bank treats the commercial and financial information submitted by exporters as confidential because public disclosure might encourage exporters to be less forthcoming in their submissions, out of concern for appearances and their own financial interests.

The government has a compelling interest in ensuring that the information it takes is of the highest quality and reliability, and disclosure of potentially sensitive commercial and financial information would jeopardize the Bank's ability to rely on any such information. A lack of reliability would limit the Bank's ability to make rational decisions regarding the viability of future export insurance transactions, thereby hindering the Bank's fulfillment of its statutory purpose.

3. Parts 2 Through 5 of the Request: Documents Withheld Under Exemption 4

In responding to Part 2 through Part 5 of the request, Defendant Export–Import Bank withheld one document under Exemption 4. The document is a two-page letter from Westinghouse Corporation to the Bank's Director. The Bank properly withheld this document in its entirety because it contains financial details about a project in China for which Westinghouse was competing and seeking the Bank's support. The information contained in the letter includes dollar amounts, names and roles of participants in the transaction, and the type of project. Disclosure of the information would allow a competitor to attempt to negotiate a lower bid with same buyer for the same project. Because this occurrence could cause substantial competitive harm to Westinghouse, the letter is protected under Exemption 4. In addition, the Court finds that the letter contains no reasonably segregable information, based on the detailed description of the letter in

the Bank's *Vaughn* Index and the notion that a letter of this nature from a major corporation to the Bank is unlikely to contain any information that is not (b)(4) protected.

### 4. Adequacy of the Bank's *Vaughn* Index

Judicial Watch challenges the adequacy of the Bank's *Vaughn* Index with respect to the Exemption 4 withholdings in Part 1 of the request. The Court chose to address this argument after addressing the Exemption 4 withholdings because this issue is easier to understand against the backdrop of the Exemption 4 discussion. Judicial Watch argues that the Bank impermissibly uses a categorical indexing technique, rather than a document-by-document indexing technique. Unlike a document-by-document indexing technique, in which the agency states its reasons for withholding each individual document, a categorical indexing technique allows the agency to group documents into categories and state its reasons for withholding each category of documents. *See NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 236, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978).

Judicial Watch argues that the Bank's categorical withholding technique does not satisfy the requirements of *Vaughn v. Rosen*, 484 F.2d 820 (D.C.Cir.1973). Specifically, Judicial Watch argues that the Bank's Index fails to adequately specify which portions of each document are disclosable and which are exempt. *See Id.*, at 827. Judicial Watch also asserts that the Bank fails to meet *Vaughn*'s requirement that the Index "subdivide document[s] under consideration into manageable parts cross-referenced to the relevant portion of the Government's justification." *Id.*

Plaintiff's argument that the Bank improperly uses a "categorical" indexing technique, as opposed to a "document-by-document" technique, is misplaced. There is no set format for a *Vaughn* Index; it is the function of the document that matters, not the form. *See Keys v. U.S. Depart-*

*ment of Justice,* 830 F.2d 337, 349 (D.C.Cir.1987); *Jones v. FBI,* 41 F.3d 238, 242 (6th Cir.1994). All that is required "is that the requester and the trial judge be able to derive form the index a clear explanation of why each document or portion of a document withheld is putatively exempt from disclosure." *Jones,* 41 F.3d at 242; *see also Gallant v. NLRB,* 26 F.3d 168, 172 (D.C.Cir.1994) ("the materials provided by the agency may take any form so long as they give the reviewing court a reasonable basis to evaluate the claim of privilege"), *citing Delaney, Migdail & Young, Chartered v. IRS,* 826 F.2d 124, 128 (D.C.Cir. 1987).

The Court finds the Bank's *Vaughn* Index adequate to support the entry of summary judgment on this issue in favor of the Bank. Rather than explaining over and over again the basis for withholding the same information from essentially identical forms, the Bank took the clear and more efficient course of setting forth only once the reason that the release of a particular type of information would be harmful to the submitter and/or the Bank. The Bank then set forth a list of the different forms that contain each type of information, and the Bates numbers for the individual documents from which such information was redacted. The Bank's Index also included the broader reasons that certain types of information are exempt from disclosure.

Judicial Watch also argues that the Bank's Index is too confusing because it lists separately 1) the types of information and documents being withheld, 2) the specific reasons for withholding each type of information and document, and 3) rationales for withholding that apply to several types of information and documents. Judicial Watch asserts that this technique makes it difficult for itself and the Court to discern which information Exemption 4 applies to and what the rationale is for each withholding under Exemption 4.

The Bank responded to Judicial Watch's concern by providing an example of how

the Index functions. *See* Def.'s Reply, at 7–8. The Bank explains that one form present in many of the responsive files is entitled "Invoice and Order to Issue Policy". Within this form, two types of information are redacted: 1) the shipment volume limit, and b) the premium amount. A separate part of the Index explains why these two types of information are withheld. For example, the "premium amount" is withheld because, in combination with other information, it could permit a competitor of the insured to determine the prices of the goods, which could enable it to offer a lower bid for the contract than that being offered by the insured. The Index notes that release of this type of information could substantially harm the insured's competitive position. The Index also provides broad rationales for withholding this type of information.

## IV. Exemption 5

 Exemption 5 of the FOIA protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party … in litigation with the agency." 5 U.S.C. § 552(b)(5). Exemption 5 protects information "normally privileged in the civil discovery context", and including the deliberative process privilege. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975). The deliberative process privilege protects the "decision making processes of government agencies." *Id.* at 150, 95 S.Ct. 1504. Opinions and judgments contained in deliberative documents may be withheld from public scrutiny in order to "prevent injury to the quality of agency decisions," *Id.* at 151, 95 S.Ct. 1504, and to encourage open, frank, uninhibited evaluation of issues by government employees, *EPA v. Mink*, 410 U.S. 73, 87, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973); *Russell v. Department of the Air Force*, 682 F.2d 1045, 1048 (D.C.Cir.1982).

 Two conditions must be met to satisfy the deliberative process privilege under Exemption 5. The documents must be both predecisional, meaning "antecedent to the adoption of an official policy," and deliberative in nature. *Jordan v. U.S. Department of Justice*, 591 F.2d 753, 774 (D.C.Cir.1978) (en banc). To establish that a document is predecisional, the agency need not point to an agency final decision, but merely establish what deliberative process is involved, and the role the that the documents at issue played in that process. *Formaldehyde Inst. v. HHS*, 889 F.2d 1118, 1123 (D.C.Cir.1989).

### A. Part One of the Request

 The documents withheld under Exemption 5 in Part 1 of the request were withheld in their entirety and were also withheld under Exemption 4. The principal documents withheld under Exemption 5 are internal staff memoranda to the Bank's Risk Committee or other authorized-decisionmakers. The decision-makers decide which applications to approve and under what terms. These memoranda contain staff evaluations, opinions, and recommendations concerning financial and technical details about the underlying transaction and whether the transaction offers reasonable assurance of repayment by the foreign buyer. Accordingly, these documents are predecisional and deliberative and protected under Exemption 5. Further, serious repercussions would ensue if these documents were disclosed. The staff must evaluate sensitive risk factors in order to meet the statutory mandate of the Bank's Board of Directors that all export insurance transactions must offer reasonable assurance of repayment. *See* The Export–Import Bank Act of 1945, § 2(b)(1)(B), as amended through P.L. 106–113, November 29, 1999. Disclosure of the staff's recommendations and opinions on these matters would make it very difficult for the staff to give open and frank comments about the risks of each transaction.

Other information being withheld in its entirety under Exemption 5 includes memoranda from one Bank employee to another, memoranda between headquarters staff

and regional office employees, Buyer Activity Reports, and Premium Rate Worksheets. These documents, like the memoranda addressed to the Risk Committee, are predecisional because they were created prior to the relevant decisions, such as determining premium rates. These documents are also deliberative because they are used for purposes such as determining whether a buyer is a good risk for any additional policies. Accordingly, these documents are also protected from disclosure under Exemption 5.

In addition, on July 6, 2000, the Court ordered the Bank to submit a sampling of the documents withheld in their entirety under Exemption 5. After conducting an *in camera* inspection, the Court is satisfied that the documents withheld in their entirety under Exemption 5 contain no reasonably segregable information.

### B. Parts Two Through Five of the Request

Parts 2 Through 5 contain three documents withheld under Exemption 5. Two are withheld in part, and one is withheld in full. First, the Bank withheld parts of a 28-page memorandum addressed to the Board of Directors, reporting on a trip to China by the Bank's Chairman. The memorandum was prepared by the Bank's staff and describes and analyzes the China trip and makes recommendations for then-current and future transactions in China. The information withheld under Exemption 5 includes internal staff recommendations, analyses, and opinions regarding future exports or types of financing projects that should or should not be supported by the Bank. Second, the Bank withheld parts of a letter to the Director under the attorney-client privilege. The withheld information is handwritten notes containing legal advice from the Office of the General Counsel regarding whether it would be appropriate under the government ethics rules for the Director to accept an invitation to dinner. The Court is satisfied that the withheld information is predecisional

and deliberative, and therefore protected from disclosure under Exemption 5. Third, the Bank withheld in its entirety a two page draft "Memorandum of Understanding Among the State Development Planning Commission of the People's Republic of China, the State Development Bank of China, the U.S. Department of Energy, and Ex-Im Bank." The unsigned draft was prepared by the Bank's Office of General Counsel, framing a proposed agreement to support clean energy projects in China. The agreement was considered, but never implemented. In withholding this draft, the Bank cites the attorney-client privilege under Exemption 5. The Court agrees, and is satisfied, based on the description of this document in the Bank's *Vaughn* Index, that it contains no reasonably segregable information.

### V. Exemption Six

 Exemption 6 of the FOIA protects from mandatory disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Records must meet two criteria to warrant the protection of Exemption 6. A court must determine first that they are "personnel and medical files and similar files," and second that their disclosure "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6); *U.S. Department of State v. Washington Post Co.*, 456 U.S. 595, 599–603, 102 S.Ct. 1957, 72 L.Ed.2d 358 (1982). The first criterion of Exemption 6 is met if the information "appl[ies] to a particular individual" and is "personal" in nature. *New York Times Co. v. NASA*, 952 F.2d 602, 606 (D.C.Cir. 1988). Further, the information need not be contained in a "personnel" file. *Washington Post Co.*, 456 U.S. at 601, 102 S.Ct. 1957. The second step of an Exemption 6 analysis is to strike a "balance between the protection of an individual's right to privacy and the preservation of the public's right to government information." *Id.* at

599, 102 S.Ct. 1957. The "public interest" in the analysis is limited to the "core purpose" for which Congress enacted the FOIA: to "shed ... light on an agency's performance of its statutory duties." *U.S. Department of Justice v. Reporters Comm. for Freedom of the Press,* 489 U.S. 749, 773, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989).

### A. Part 1 of the Request

██ First, the Bank is withholding the bank account numbers of payors on copies of checks and wire transfers under Exemptions 4 and 6. The Bank is applying Exemption 6 to those bank accounts that might be in the name of a particular individual, as opposed to the name of a company or business entity. This invocation of Exemption 6 is proper. Disclosing personal bank account numbers would constitute a clearly unwarranted invasion of personal privacy because the information could be used for nefarious purposes. In addition, there is no public interest in this information.

Second, the Bank seeks to withhold the "resumes of executives of companies applying for export insurance and/or related parties to the proposed insurance transactions." The Bank states that it is not aware of any public interest that would be served by disclosing these resumes. The Bank adds that because the facts in the resumes are all related to a particular individual, any attempt to segregate those facts would either result in a disclosure that would invade the person's privacy, or render the document useless.

This Court and other courts agree that information in the resumes cannot be reasonably segregated. If too little information is be disclosed, the bits of disclosed information are meaningless. In contrast, if too much information is disclosed, it could easily be used to identify the individual. Information in the resumes is likely available from other sources such as educational and professional directories or the Internet. Thus, disclosure of even por-

tions of the resumes would enable the public "to match up employment history, schooling accomplishments, and other resume matter ... to indirectly identify the applicant." *Holland v. CIA,* No. 92–1233, 1992 WL 233820 (D.D.C. Aug. 31, 1992) (citing *Core v. United States Postal Service,* 730 F.2d 946, 948 (4th Cir.1984) ("Even if their names were deleted, the [employment] applications generally would provide sufficient information for interested persons to identify [the applicants] with little further investigation")). Accordingly, these resumes must be withheld in full or disclosed in their entirety.

The Court finds that there is a public interest in disclosing the resumes of executives of companies who do business with the Bank. In an analogous situation, the *Core* court found that "the public has an interest in the competence of people the [government] employs and in its adherence to regulations governing hiring. Disclosure will promote these interests." *Core,* 730 F.2d at 948. Likewise, in the instant case, the public has an interest in knowing the qualifications of the individuals who run businesses that the Bank approves for insurance. The public also has an interest in ensuring the Bank adheres to its regulations regarding who is approved for insurance. Disclosure of the resumes at issue in this case will promote these interests. Because the Court finds there is a public interest in the resumes, some, but not all, of the resumes shall be disclosed to Judicial Watch.

The *Core* court found, with respect to successful job applicants, that "[t]he information they furnished is not derogatory. It is simply the type of information every applicant seeks to bring to the attention of a prospective employer." *Id.* The *Core* court also found that "disclosure of information submitted by ... successful applicants would cause but a slight infringement on their privacy", *Id.,* and accordingly ordered the job applications to be disclosed. Likewise, the information sought here is not derogatory and

serves a public interest. When the slight infringement of personal privacy is weighed against the public interest using the Exemption 6 standard of "clearly unwarranted invasion of personal privacy", 5 U.S.C. § 552(b)(6), the balance tips in favor of disclosure. Accordingly, the resumes of those individuals whose applications were approved and who are doing business with the Bank shall be disclosed. However, telephone numbers, street addresses, e-mail addresses, and similar information shall be withheld pursuant to Exemption 6.

In contrast, the resumes of those individuals whose insurance applications were withdrawn or declined may be withheld. Those individuals' privacy interests outweigh the public interest in obtaining their resumes. The *Core* court held that disclosure of such information "may embarrass or harm applicants who failed to get a job." *Id.* The same is true of applicants who failed to obtain insurance from the Bank or who withdrew their applications. In addition, the public interest in the resumes of those individuals is minimal. As the *Core* court held, "[d]isclosure of the qualifications of people who were not appointed is unnecessary for the public to evaluate the competence of people who were appointed." *Id.* Measured against these standards, the Bank properly withheld these resumes because the privacy interests outweigh any public interest in these documents.

### B. Parts Two Through Five of the Request

The Bank withheld the following types of information under Exemption 6: passport numbers, a social security number, and credit card numbers. Like the bank account numbers discussed above, this information is personal and its disclosure would constitute a clearly unwarranted invasion of personal privacy because it could be misused. Further, its disclosure serves no public interest.

### VI. Segregability

The FOIA requires that if a record contains information that is exempt from disclosure, any "reasonably segregable information" must be disclosed after deletion of the exempt information unless the non-exempt information is "inextricably intertwined with the exempt portions." 5 U.S.C. § 552(b); *Mead Data Cent., Inc. v. United States Dept. of the Air Force*, 566 F.2d 242, 260 (D.C.Cir.1977). In addition, this Circuit has recently held that a District Court considering a FOIA action has "an affirmative duty to consider the segregability issue *sua sponte.*" *Trans–Pacific Policing Agreement v. United States Customs Service*, 177 F.3d 1022, 1028 (D.C.Cir.1999).

To demonstrate that all reasonably segregable information has been released, the agency need only show "with 'reasonable specificity'" why a document cannot be further segregated. *Armstrong v. Executive Office of the President*, 97 F.3d 575, 578–79 (D.C.Cir.1996). The agency is not required to "commit significant time and resources to the separation of disjointed words, phrases or even sentences which taken separately or together have minimal or no information content." *Mead Data*, 566 F.2d at 261, n. 55. The Court is satisfied, as discussed throughout this opinion, that the Bank provided Judicial Watch with all reasonably segregable information.

### CONCLUSION

The Bank's search for records responsive to Judicial Watch's request was adequate. Except for defendant's failure to disclose the resumes, as discussed above, the Bank properly withheld information from the Judicial Watch under FOIA Exemptions 4, 5, and 6, and the Bank provided all reasonably segregable information to Judicial Watch. A separate order shall issue this date.

*ORDER*

This matter comes before the Court on defendant Export–Import Bank's ("the Bank") motion for summary judgment and plaintiff Judicial Watch's cross motion for summary judgment. Upon consideration of those motions, and the entire record herein, for the reasons stated in an accompanying memorandum opinion, it is hereby ORDERED that

The Bank's motion is GRANTED in part and DENIED in part;

Judicial Watch's motion is GRANTED in part and DENIED in part;

The Bank shall release to Judicial Watch, consistent with the accompanying memorandum opinion, copies of all resumes, withheld under Exemption 6, of executives of companies whose applications have been approved by the Bank and who conducted business with the Bank, deleting only telephone numbers, street addresses, e-mail addresses, and similar information; and it is

FURTHER ORDERED that in all other respects, summary judgment is entered for the Bank and against Judicial Watch; and it is

FURTHER ORDERED that this case is DISMISSED WITH PREJUDICE from the docket of this Court.

SO ORDERED.