**THE PROVIDENCE JOURNAL COMPANY**

v.

**CONVENTION CENTER AUTHORITY.**

**No. 99–320–Appeal.**

Supreme Court of Rhode Island.

June 21, 2001.

---

**42**

Raymont A. Marcaccio, Kristin E. Rodgers, Providence, for Plaintiff.

David A. Wollin, Providence, for Defendant.

Present WILLIAMS, C.J., LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

GOLDBERG, Justice.

This case came before the Supreme Court on March 13, 2001, on appeal from the entry of summary judgment in favor of the defendant, Convention Center Authority (Authority or defendant). The Providence Journal Company (Journal or plaintiff) has appealed the entry of summary judgment based on its contention that certain records sought by the Journal are subject to disclosure pursuant to the Access to Public Records Act (APRA), G.L. 1956 chapter 2 of title 38. We affirm in part and reverse in part.

### Facts and Travel

On July 31, 1996, Michael Stanton (Stanton), a reporter for the Journal, sent a written request to the Authority's executive director seeking records pertaining to the Mobil Celebrity Golf Invitational Tournament (golf tournament) hosted by the Westin Hotel (Westin) on August 3–6, 1995, and the Verrazano Day Banquet (banquet) held at the Convention Center on May 19, 1996. With respect to the golf tournament, the request specifically sought "correspondence, memoranda and other documents regarding negotiations that led to the booking of the event, the offering of comp[limentary] rooms, and the hotel's ultimate financial gain or loss." With respect to the banquet, Stanton requested copies of "correspondence, memoranda and other documents regarding negotiations that led to the booking of the event, any discounts, and the Convention Center's ultimate gain or loss from hosting the event." Additionally, he sought a breakdown of the complimentary rooms that the Westin has awarded since it opened and

for what events and purposes those rooms have been given, as well as information on any other banquets that have received any type of discount.

On August 8, 1996, a letter was sent to Stanton from counsel for the Authority denying his request. Stanton was given several reasons for that denial. The Authority took the position that the information sought by the Journal was not information subject to disclosure pursuant to APRA because "it consists of trade secrets and commercial or financial information which is of a privileged or confidential nature, in addition to such other exemptions and/or protections as are contained in the Rhode Island General Laws." Further, the Authority denied Stanton's request on the basis that it was "broad, vague and although not clearly stated, suggests that it will be used for commercial purposes."

Thereafter, on August 21, 1996, Stanton sent another "narrower request." In this second request, Stanton sought essentially the same information he had requested in the first instance. With respect to the golf tournament, he sought "contracts signed with tournament promoters and corporate sponsors, as well as records reflecting negotiations leading up to that agreement among hotel management, tournament officials and members of the [Authority] and state Department of Economic Development." Although Stanton made it clear that he was not interested in the names of the individuals who stayed in the rooms, he requested the number of complimentary rooms provided to the tournament, the value of those rooms, and the profit or loss of the hotel from the event. With respect to the banquet, Stanton requested the "contract for the event, as well as relevant documents reflecting negotiations leading up to the agreement." Specifically, he sought information about the number of

people who attended the dinner and the per person cost of the dinner, both to the Authority and the banquet organizers and attendees, as well as the net profit or loss to the Authority for the event. Stanton reiterated his request for information about other banquets that have been held at the Westin and the Convention Center, as well as the number of complimentary rooms that have been awarded by the Westin since it opened, and how that has affected the net profit or loss to the Authority. Again, the request was denied. In this second denial, counsel for defendant provided certain rate schedules that had been used by the Authority as well as newsletters and general public listings that described events that had been held at the Convention Center. The letter explained that the reasons for not releasing the specific information requested with respect to the golf tournament and the banquet remained the same.

On June 13, 1997, the Journal filed a complaint in Superior Court alleging that the Authority's failure to make the requested documents available for inspection constituted a violation of the Journal's rights under APRA. In addition, plaintiff asserted that this refusal violated its rights under the Constitution of the United States, the Constitution of the State of Rhode Island and the common law. The Journal's constitutional and common law claims were dismissed as the result of a pretrial motion by defendant and are not before the Court. On April 20, 1998, the Journal filed a motion for summary judgment on its remaining claims. The Authority made a timely objection and filed a cross-motion for summary judgment containing six supporting affidavits from individuals familiar with the business of the Convention Center and the Westin.[1] The

1. The affidavits were given by: Nicholas A.

Langella, general manager of the Convention

affiants collectively detailed what they believed to be the anticompetitive effects of publicly disclosing the information sought by the Journal. Each affiant separately reached the conclusion that the information requested by the Journal contained confidential commercial and financial information of a sort that is not typically shared with the public.

In an attempt to depose the affiants before a hearing on the summary judgment motions, plaintiff moved for a continuance. The defendant thereafter sought a protective order to prevent any information learned in these proceedings from being disseminated to the public. The trial justice then conducted an *in camera* inspection of certain records and affidavits pertaining to the request. These records have not been made part of the record on appeal. In granting the Authority's motion for a protective order the trial justice stated that she was satisfied, upon reviewing the documents, that the Authority set forth a valid claim of privilege respecting confidential information. Specifically, the trial justice stated,

> "it was clear in reviewing these [documents] that in the hands of a competitor, probably someone else in this same business could look at these records and determine certain kinds of trends. That would disadvantage the Convention Center as far as its marketing position is concerned and, therefore, the [c]ourt feels that the Convention Center did, in fact, claim a valid exemption under the Rhode Island Access to Public Records Act, and therefore the [c]ourt grants the motion for protective order."

On March 25, 1999, the trial justice heard the parties' motions for summary judgment and thereafter entered an order granting the Authority's motion and denying that of the Journal. The trial justice stated that there was an "intricate connection" between the documents that were the result of the negotiation process and the contract with the negotiated rate sought by the Journal. Specifically, she stated,

> "I think that there is an intricate connection between the documents that are submitted which resulted in the negotiations process and the financial document which is the contract with the negotiated rate that the Journal is seeking. I don't think based upon how I had looked at these documents that it would be possible to separate out what [the Journal is] looking for without disclosing what the [c]ourt considers [to be] protected under the Act. The documents that are submitted by persons seeking to utilize the Convention Center involve financial records[,] [including] records of insurance [and] customer information[;] [that is] information that people presume will be kept confidential when they are engaging in the negotiating process."

The trial justice further explained that the records sought by the Journal contain confidential financial records, the release of which would have an impact on the Convention Center's competitive advantage. In agreeing that the enabling statute states that the Convention Center is supposed to operate as profitably as possible, the trial justice noted that the statute "doesn't say, however, that the public in general with the Providence Journal in particular is supposed to be the entity that

Center; Timothy P. Kirwin, general manager of the Westin; James P. McCarvill, executive director of the Authority; James H. Massone, general manager of the Service America Corporation; Martha J. Sheridan, interim president and vice president of the Providence–Warwick Convention & Visitors Bureau; and Meghan M. McSkimming, general manager of Production Group International.

monitors that * * *." The Journal has appealed.

## Discussion

On appeal, the Journal contended that the trial justice erred in finding that the records sought from the Authority were exempt from disclosure under APRA. The plaintiff argued that it did not seek any financial information that may be part of the materials provided to the Authority by its customers. Instead, the Journal has argued to this Court that the records requested are the *"fruits* of the negotiating process between the sponsors of Mobil Golf and the Verrazano Day events, and the Authority, to wit, the contracts for the events, the documents evidencing the negotiations leading up to the agreement, and the provision of complimentary rooms, discounted rates or other benefits." (Emphasis in the original.) This argument is incorrect. As noted, Stanton's August 1996 letter specifically included a request for all relevant documents "reflecting [the] *negotiations leading up to*" the agreements between the parties. (Emphasis added.) This request is not the "fruits" of the process, but is the spade work performed in the garden leading up to the harvest. With the exception of the final contract, the Journal asked to examine the negotiating process itself. The Journal also argued that because the documents requested were "created" as the result of the negotiations between the facilities and the event sponsors, the documents were not "obtained from" the sponsors and therefore were not covered by the exemption, and are thus subject to public disclosure. This argument ignores the fact that documents reflecting the give and take of arm's length negotiations obviously reflect, at a minimum, a party's offer, response, counteroffer and the price a prospective customer is willing or able to spend for a specific service. Without regard to which party prepared the material, it amounts to commercial information not ordinarily made public.

The Authority has maintained that the documents sought by the Journal are protected from public disclosure under APRA. Relying on the *Critical Mass* test set forth in *Critical Mass Energy Project v. Nuclear Regulatory Commission,* 975 F.2d 871, 879 (D.C.Cir.1992), the Authority contended that the commercial or financial information provided to the government entity on a voluntary basis is confidential, if "it is of a kind that would customarily not be released to the public by the person from whom it was obtained." Additionally, the Authority argued that the affidavits presented, which were unrebutted, established that the requested material consisted of confidential commercial and financial information that is not ordinarily disclosed to the public by the person from whom it was obtained. Further, the Authority maintained that the affidavits also established that customers who have contacted the Convention Center and the Westin do not expect the commercial and financial information they provide to be made public and, if such materials were made public, it would "severely jeopardize the competitive position and operations of the Convention Center and the Westin." Although the release of documents that fall squarely within APRA may present a real danger to the continued competitive vitality of these enterprises, it is not determinative of the issues before this Court.

 We note at the outset that the hearing justice found and the Authority has argued that the release of the requested records would hurt the Authority's competitive advantage and conflict with its statutory mission to operate as profitably as possible. However, these considerations, although real and valid, have no bearing on whether records held by a pub-

lic body are subject to disclosure under APRA. This Court has previously held that applicability of APRA to records held by a public body is not determined by a balancing test. Simply put, the records are subject to public disclosure unless they fall within one of the enumerated exceptions contained in APRA. *See Direct Action for Rights and Equality v. Gannon,* 713 A.2d 218, 225 (R.I.1998) (rejecting the argument that an administrative agency must demonstrate that relevant privacy interests outweigh the public's right to access records); *see also Providence Journal Co. v. Kane,* 577 A.2d 661, 663 (R.I.1990) (holding that "[a]ny balancing of interests arises only after a record has first been determined to be a public record").

▇▇ The law is well settled in Rhode Island, that this Court will review a grant of summary judgment on a *de novo* basis. *See Marr Scaffolding Co. v. Fairground Forms, Inc.,* 682 A.2d 455, 457 (R.I.1996). "In conducting such a review, we are bound by the same rules and standards as those employed by the trial justice." *M & B Realty, Inc. v. Duval,* 767 A.2d 60, 63 (R.I.2001) (citing *Rotelli v. Catanzaro,* 686 A.2d 91, 93 (R.I.1996)). The party opposing summary judgment bears the burden of proving, by competent evidence, the existence of facts in dispute. *See Accent Store Design, Inc. v. Marathon House, Inc.,* 674 A.2d 1223, 1225 (R.I.1996). "However, the opposing part[y] will not be allowed to rely upon mere allegations or denials in [the] pleadings. Rather, by affidavits or otherwise [the opposing party has] an affirmative duty to set forth specific facts showing that there is a genuine issue of material fact." *Bourg v. Bristol Boat Co.,* 705 A.2d 969, 971 (R.I.1998).

### Documents that Resulted from Negotiations

▇▇ The stated purpose of APRA is set forth in § 38–2–1. It provides:

"The public's right to access [public] records * * * and the individual's right to dignity and privacy are both recognized to be principles of the utmost importance in a free society. The purpose of this chapter is to facilitate public access to [public] records. * * * It is also the intent of this chapter to protect from disclosure information about particular individuals maintained in the files of public bodies when disclosure would constitute an unwarranted invasion of personal privacy."

This Court has recognized that the basic policy of APRA favors public disclosure of the records of governmental entities. *Providence Journal Co.,* 577 A.2d at 663; *Pawtucket Teachers Alliance v. Brady,* 556 A.2d 556, 558 (R.I.1989). We also have observed, however, that "the Legislature did not intend to empower the press and the public with carte blanche to demand all records held by public agencies." *Providence Journal Co. v. Sundlun,* 616 A.2d 1131, 1134 (R.I.1992). APRA contains certain exceptions, one of which makes "[t]rade secrets and commercial or financial information obtained from a person, firm, or corporation which is of a privileged or confidential nature" exempt from disclosure. Section 38–2–2(4)(B). Because APRA mirrors the Freedom of Information Act (FOIA), 5 U.S.C.A. § 552 (West 1996), it is appropriate to look to Federal case law interpreting FOIA to assist in our interpretation of the statute.

Like APRA, FOIA provides for the disclosure of records held by governmental agencies, unless the documents fall within the enumerated exceptions. *See Department of the Interior and Bureau of Indian Affairs v. Klamath Water Users Protective Association,* 532 U.S. 1, ——, 121 S.Ct. 1060, 1065, 149 L.Ed.2d 87, 95 (2001). FOIA has a similar exemption to the

APRA exemption at issue in this case, that provides that "trade secrets and commercial or financial information obtained from a person [that are] privileged or confidential" are not subject to public disclosure. *See* 5 U.S.C.A. § 552(b)(4). This issue was scrutinized in *Critical Mass*. In that case, the Court of Appeals for the District of Columbia examined whether the granting of summary judgment in favor of the Nuclear Regulatory Commission (NRC) was in error. The district court concluded that certain requested safety reports provided to the NRC by another entity were commercial and confidential, therefore exempt from disclosure under 5 U.S.C.A. § 552(b)(4).[2] Critical Mass had sought safety reports prepared by the Institute for Nuclear Power Operations (INPO) that were voluntarily provided to the NRC, conditioned on the promise that the reports would not be released without INPO's consent. The NRC denied the disclosure request, maintaining that the reports contained confidential commercial information that was exempt from FOIA. Critical Mass then filed suit seeking to compel the disclosure of the reports. The district court found that the documents were "both commercial and confidential and therefore exempt under § 552(b)(4)."

 In affirming the district court, the court of appeals reaffirmed the two-part test established in *National Parks and Conservation Association v. Morton*, 498 F.2d 765 (D.C.Cir.1974), which defined as confidential any financial or commercial information whose disclosure would be likely either "(1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was

obtained." *Id.* at 770. The court in *Critical Mass* confined the test in *National Parks* to those cases in which a FOIA request is made for financial or commercial information that a person is obliged to provide to the Government. The court added, however, that "financial or commercial information provided to the Government *on a voluntary basis* is 'confidential' for the purpose of Exemption 4 if it is of a kind that would customarily not be released to the public by the person from whom it was obtained." *Critical Mass*, 975 F.2d at 879. (Emphasis added.) We agree with the holding in *Critical Mass* and its progeny and adopt the test set forth therein, including the protection afforded to commercial and financial information that the provider would not customarily release to the public.

 Here, the Journal specifically sought "documents regarding negotiations that led to the booking of the event,"— documents we deem to fall squarely within the exemption for confidential commercial or financial information contained in APRA. As noted, information provided to the Authority during the give and take of negotiations, including offers, responses and counteroffers, with respect to both the golf tournament and the banquet, including, but not limited to a prospective customer's budget, insurance needs, attendance projections and funding considerations constitutes confidential commercial or financial information provided for the purpose of negotiating an agreement. Regardless of which side produced the particular document, the information was developed during the negotiation process and is of the sort that would not customarily be disclosed to the public either by Mobil Oil, Inc., or the coordinators of the

---

**2.** 5 U.S.C.A. § 552(b)(4) (West 1996) provides: "This section does not apply to matters that are—* * * trade secrets and commercial or financial information obtained from a person and privileged or confidential * * *."

Verrazano Day banquet. *See Judicial Watch, Inc. v. Export–Import Bank,* 108 F.Supp.2d 19, 28 (D.D.C.2000) ("documents prepared by the federal government may be covered by Exemption 4 if they contain summaries or reformulations of information supplied by a source outside of the government"); *see also Gulf & Western Industries, Inc. v. United States,* 615 F.2d 527, 529–30 (D.C.Cir.1979) (documents were not disclosed because release of information would disclose data supplied to government from a person outside the government). Accordingly, we conclude that the hearing justice did not err in finding that the documents reflecting the negotiation process must, of necessity, include confidential financial information derived from the prospective customer that would not customarily be disclosed and cannot be redacted.

The Court recognizes that the situation we face in this case is unique. The Authority is a public corporation, having a separate legal existence from the state, and was created by the General Assembly to establish a suitable facility for conventions, meetings, banquets and the like in furtherance of the economic prosperity of the state.[3] Pursuant to the findings of the General Assembly, the Authority is vested with the responsibility of managing and operating these facilities to "the greatest public benefit and at the least public cost."

Thus, the Authority is in the anomalous position of operating as a proprietary enterprise in a highly competitive field, but as a state agency bound by the enactments of the General Assembly. The Authority, by virtue of its enabling act, is subject to APRA.[4] This, however, also includes the exemptions contained in APRA and the Authority's concomitant obligation to protect from disclosure the confidential financial information of its clients and prospective clients that might reasonably be expected to remain confidential. It was established, through affidavit that "customers who contract with the [Authority] do not expect that the documents and financial information they provide will be *disclosed to the public.* * * * [I]t is commonly understood during negotiations that the information shared by the customers * * * will remain confidential." This evidence is uncontradicted.

Therefore, we reject the Journal's contention that the information sought is not confidential and privileged commercial or financial information because it consisted of documents and information produced by the Authority during the negotiation process and was not "obtained from" a third party.

However, it was posited by the Convention Center's general manager that the primary reason for the Convention Center's ability to attract high profile, long-

---

3. General Laws 1956 § 42–99–2 provides:
 "**Legislative Findings.**—It is hereby found that:
 (1) There is a serious shortage of suitable facilities for conventions and related exhibition, meeting, banquet, and other facilities customarily incident thereto, in the state;
 (2) Private enterprise alone is not able to provide the necessary facilities;
 (3) The public welfare and the further economic development and the prosperity of the state requires the establishment of these facilities and the financing thereof, as provided in this chapter; and

 (4) The facilities will be managed and operated with the greatest public benefit and at the least public cost if provision is made for leases, concessions, and other contracts with persons, firms, and corporations, as provided in this chapter."

4. Section 42–99–17 provides in pertinent part:

 "**Applicability of other laws.**—The corporation shall be subject to the provisions of chapter 2 of title 38 ('Access to Public Records') * * *."

term and repeat customers are attractive prices and package deals on an event-specific basis compared with other cities, Boston in particular. He explained that disclosure of such information seriously would hinder the Convention Center's ability to maintain these long-term and repeat customers, as well as to attract new customers because the Authority would be obligated to inform new customers at the start of any business relationship that all the information provided to the Authority relating to that customer's finances and any documents created relating to events held at the Convention Center and the Westin could be disclosed to the public. Such a situation would not be beneficial to the business venture engaged in by the Authority and could be harmful to the State of Rhode Island. It is clear that the purpose of creating the Authority was to attract business to the State of Rhode Island by maintaining a suitable convention facility. Although we recognize that the mission of the Authority may effectively become unattainable if it is unable to secure business or foster a secure and reliable business relationship because of its compliance with APRA, we suggest that the remedy lies with the General Assembly. The role of this Court is to determine whether an Act of the General Assembly is applicable in a given case, without regard to the resultant hardship.

The Journal had also requested all documents reflecting the Authority's ultimate profit and loss for both the golf tournament and the banquet and all other similar events. However, it has not been established that any such records exist. Clearly, the Authority is not required to compile that information in response to a request made under APRA.[5]

### Final Contract

■■■ Although we have determined that documents reflecting the negotiations between the Authority and its prospective customers are covered by § 38–2–2(4)(B) and are not subject to disclosure under APRA, the final agreement reached between the Authority and the parties representing the golf tournament and the banquet is another matter. We recognize that the hearing justice determined that this material may not be segregable. Specifically, she stated it would be impossible "to separate out what [the Journal is] looking for without disclosing what the Court considers is protected under the Act." However, she made no specific finding relative to the entire agreement; nor are we persuaded that portions of the agreement are statutorily exempt from disclosure. Indeed, the statute contemplates a situation in which any reasonably segregable portion of a public record be made available for public inspection.[6] Again, we look to federal case law for guidance on this issue. The United States District Court for the District of Columbia has taken the approach that agencies and courts dealing with FOIA requests are obliged to assess whether nonexempt material can reasonably be segregated from exempt material.

---

5. Section § 38–2–3(f) provides:

"Nothing in this section shall be construed as requiring a public body to reorganize, consolidate, or compile data not maintained by the public body in the form requested at the time the request to inspect the public records was made [except to the extent that such records are in an electronic format and the public body would not be unduly burdened in providing such data."]

6. Section 38–2–2(4)(ii) provides:

"However, any reasonably segregable portion * * * of a public record excluded by this section shall be available for public inspections after the deletion of the information which is the basis of the exclusion, if disclosure of the segregable portion does not violate the intent of this section."

See *Piper & Marbury L.L.P. v. United States Postal Service,* No. CIV.A. 99–2383, 2001 WL 214217 (D.D.C. Mar.6, 2001). With respect to contracts, the *Piper* court suggested that no contract could be exempted from FOIA in its entirety. Specifically the court stated that "[w]hile contracts may certainly contain information, such as the price of goods being sold, the entire contract itself cannot qualify as 'information' in any ordinary sense of either word." *Id.* at *4. The thrust of the argument is essentially that a contract cannot consist entirely of confidential information, and, based upon the spirit of FOIA, every effort should be made to segregate those portions of the requested documents that contain information exempted from disclosure. *See PHE, Inc. v. Department of Justice,* 983 F.2d 248, 252 (D.C.Cir.1993) (where the court held that the district court erred in approving the government's withholding of information in the FOIA request without making an express finding on segregability).

 In the case at bar, although we are of the opinion that the documents produced during and as a result of the negotiations between the Authority and Mobil Oil, Inc. and the coordinators of the Verrazano Day banquet are not subject to disclosure, we are not convinced that the final contract is exempt. Once the negotiations are solidified into a final agreement between the parties that agreement, or at least portions of the agreement, should then be available to the public pursuant to APRA.[7] Obviously, if the agreement includes confidential or privileged financial information of the customer, such as insurance or financing consideration and profit

projections, and is segregable, that limited information is subject to redaction.

## Conclusion

For the aforementioned reasons, the appeal is sustained in part and denied in part. We deny the Journal's appeal with respect to the documents produced relative to the negotiations between the representatives of the golf tournament and banquet because the information amounts to confidential commercial or financial information obtained from the Authority's prospective customers. Further, we adopt the test set forth in *Critical Mass* to determine what qualifies as confidential commercial or confidential information in the context of APRA. However, with respect to the final contracts entered into by the parties, we reverse the trial justice's ruling based upon our determination that final contracts between the parties are subject to APRA and the public's right of access. Accordingly, the judgment appealed from is affirmed in part and reversed in part. The papers in this case are remanded to the Superior Court in accordance with our decision.

FLANDERS, Justice, dissenting in part and concurring in part.

I respectfully disagree with the majority's decision to affirm any part of the summary judgment that entered in favor of the Convention Center Authority (Authority). The record on appeal does not support the Superior Court's conclusion that *all* the information requested by the Providence Journal Company (Journal) was exempt from disclosure under G.L. 1956 § 38–2–2(4)(i)(B) of the Access to Public Records Act (APRA) (chapter 2 of

---

7. Again, we recognize that this holding may have an adverse impact on the Authority's competitiveness because its privately owned competitors are not required to make public their contracts and presumably the prices charged for the use of their facilities. However, the resolution of this issue rests with the General Assembly and not this Court.

title 38). In fact, it is unclear from the court's decision exactly how it applied this APRA exemption to the requested information and documents containing that information. What is apparent, however, is that the motion justice erred by limiting her analysis to the requested documents as a whole rather than by applying the APRA exemption in question to the information contained within those documents. *See* § 38–2–2(4)(ii) ("[A]ny reasonably segregable portion * * * of a public record excluded by this section shall be available for public inspections after the deletion of the information which is the basis of the exclusion, if disclosure of the segregable portion does not violate the intent of this section."). By so limiting her review to the documents as a whole, the motion justice failed to segregate information that is not exempt from any exempt information in the documents she examined. In addition, even when the motion justice endeavored to apply the APRA requirements that must be satisfied before information in a document can qualify for the above-referenced exemption, it is unclear whether she did so correctly. In particular, the record suggests that at least some (if not all) the information requested by the Journal should not have been declared exempt from disclosure because it was not in fact "obtained from a [nongovernmental] person"—as APRA requires for such information to be exempt under § 38–2–2(4)(i)(B).

Finally, it is unclear to me exactly how and why the motion justice concluded that *all* the information requested by the Journal was "commercial or financial information obtained from a person, firm, or corporation which is of a privileged or confidential nature." Because this Court has not had an opportunity to articulate how to apply this particular APRA exemption, I would remand this case to the Superior Court for a reconsideration of the motion consistent with the analysis of this exemption that is set forth below. Accordingly, I disagree with the majority's decision to affirm the motion justice's blanket exemption for the Authority's documents that refer to or were created "regarding negotiations that led to the booking of the event, the offering of complimentary rooms, and the hotel's ultimate financial gain or loss."[8] Similarly, with respect to the other operational data requested, including banquet-discount information and the number of complimentary rooms provided for the events in question, I do not believe that § 38–2–2(4)(i)(B) allows a blanket exemption to be thrown over this requested information, nor does the record support the majority's suggestion that no such information exists in any of the Authority's documents.

### Analysis

The stated purpose of the APRA is contained in § 38–2–1 (as amended in P.L. 1998, ch. 378, § 1).[9] It provides as follows:

---

8. For example, consider that portion of a hypothetical memorandum created by the Authority that stated as follows: "During negotiations with the golf tournament officials, we told them that ten (10) is the maximum number of complimentary rooms we would provide to the tournament." Such information would not be exempt under G.L.1956 § 38–2–2(4)(i)(B) because it is not information "obtained from a person" but information obtained from the Authority itself. The majori-

ty's opinion fails to recognize this distinction, and instead accepts the motion justice's conclusory "intricate connection" ruling as blanketing all information contained in documents relating to negotiations with customers of the Authority.

9. In my opinion the 1998 amendments merely clarified legislative intent rather than effecting a substantive change in the legislation. Moreover, "this Court has traditionally applied the law in effect at the time we consider

"The public's right to access to public records and the individual's right to dignity and privacy are both recognized to be principles of the utmost importance in a free society. *The purpose of this chapter is to facilitate public access to public records.* It is also the intent of this chapter to protect from disclosure information about particular individuals maintained in the files of public bodies when disclosure would constitute an unwarranted invasion of personal privacy." (Emphasis added.)

The purpose of APRA "to facilitate public access to public records" mirrors the Freedom of Information Act (FOIA), its federal counterpart: namely, " 'to open agency action to the light of public scrutiny.' " *United States Department of Justice v. Reporters Committee For Freedom of the Press,* 489 U.S. 749, 772, 109 S.Ct. 1468, 1482, 103 L.Ed.2d 774, 795 (1989). Therefore, recognizing that "[s]unlight is said to be the best of disinfectants," Louis D. Brandeis, *Other People's Money* 92 (1932), this Court has held that, in the interest of increasing public awareness of governmental activities, the basic policy of APRA favors public disclosure of government records. *Providence Journal Co. v. Kane,* 577 A.2d 661, 663 (R.I.1990); *Pawtucket Teachers Alliance Local No. 920 v. Brady,* 556 A.2d 556, 558 (R.I.1989). And yet, because "the Legislature did not intend to empower the press and the public with carte blanche to demand all records held

by public agencies," *Providence Journal Co. v. Sundlun,* 616 A.2d 1131, 1134 (R.I. 1992), it also enacted § 38–2–2(4)(i)(B), thereby exempting from public disclosure "[t]rade secrets and commercial or financial information *obtained from a person, firm, or corporation* which is of a privileged or confidential nature." (Emphasis added.)

Because APRA is a Rhode Island version of the FOIA, 5 U.S.C.A. § 552 (West 1996), I concur with the Court that we should look to federal cases interpreting FOIA to ascertain if they shed any light on how this exemption should be construed. Like APRA, "[u]pon request, FOIA mandates disclosure of records held by a [governmental] agency, * * * § 552, unless the documents fall within enumerated exemptions." *Department of the Interior v. Klamath Water Users Protective Association,* 532 U.S. 1, ——, 121 S.Ct. 1060, 1065, 149 L.Ed.2d 87, 95 (2001). But, quite importantly, "these limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the [FOIA]." *Department of the Air Force v. Rose,* 425 U.S. 352, 361, 96 S.Ct. 1592, 1599, 48 L.Ed.2d 11, 21 (1976). Thus, under FOIA and APRA, "[c]onsistent with the Act's goal of broad disclosure, these exemptions have been consistently given a narrow compass." *United States Department of Justice v. Tax Analysts,* 492 U.S. 136, 151, 109 S.Ct. 2841, 2851, 106 L.Ed.2d 112, 129 (1989); *see also Federal Bureau*

---

an appeal." *Solas v. Emergency Hiring Council of the State of Rhode Island,* No. 99–68, slip op. at 9, 774 A.2d 820, ——, 2001 WL 674152 (R.I.2001). The language of § 38–2–1 enacted in 1979 (P.L.1979, ch. 202, § 1) and effective in 1996 and 1997, when the Convention Center denied both of the Journal's information requests, provided that:

"The public's right to access to records pertaining to the policy making responsibilities of government and the individual's right to dignity and privacy are both recog-

nized to be principles of the utmost importance in a free society. The purpose of this chapter is to facilitate public access to governmental records which pertain to the policy making functions of public bodies and/or are relevant to the public health, safety, and welfare. It is also the intent of this chapter to protect from disclosure information about particular individuals maintained in the files of public bodies when disclosure would constitute an unwarranted invasion of personal privacy."

*of Investigation v. Abramson,* 456 U.S. 615, 616, 102 S.Ct. 2054, 2057, 72 L.Ed.2d 376, 380 (1982) ("FOIA exemptions are to be narrowly construed."). Moreover, the governmental entity bears the burden of proving the applicability of any statutory exemption it asserts when denying a public-records request. *See Piper & Marbury, L.L.P. v. United States Postal Service,* No. Civ. A. 99–2383, 2001 WL 214217, at *1 (D.D.C. March 6, 2001). Accordingly, taking our cue from federal cases interpreting FOIA exemptions, a reviewing court must construe APRA's exemptions narrowly because they trench upon the dominant public-disclosure objective of APRA. Moreover, the governmental entity invoking the exemptions bears the burden of proving that the information should not be disclosed by showing that it falls within the "narrow compass" of any such exemption. In throwing a blanket exemption over all of the requested information, I do not believe that the motion justice heeded these controlling principles.

Exemption 4 of FOIA, like APRA's § 38–2–2(4)(i)(B), protects from disclosure "trade secrets and commercial or financial information obtained from a person [that are] privileged or confidential." 5 U.S.C.A. § 552(b)(4). The focus of Exemption 4 is on information provided to the governmental agency by a person outside that agency; thus, it does *not* protect information generated by the government agency itself. *See Federal Open Market Committee v. Merrill,* 443 U.S. 340, 360, 99 S.Ct. 2800, 2812, 61 L.Ed.2d 587, 603 (1979) (holding that the only type of entity

that is not considered a "person" under Exemption 4 is an agency of the federal government). Therefore, FOIA's Exemption 4, like APRA's § 38–2–2(4)(i)(B), would exempt from disclosure only the information requested by the Journal if it were (1) of a commercial or financial nature,[10] (2) obtained from a person, firm, or corporation other than the Authority itself or one of its sub-agencies, departments, or entities, and (3) deemed privileged or confidential. Because there is no question but that the Authority is a governmental agency, it was required to prove that it satisfied each of the exemption's prerequisites before the information in question could be protected from disclosure. Thus, I would analyze each of the Journal's requests under this particular exemption by asking and answering the following three questions:

1. *Is the Information Requested of a Commercial or Financial Nature?*

"In the context of Exemption 4, the terms 'commercial' and 'financial' should be given their ordinary meanings." *Judicial Watch, Inc. v. Export–Import Bank,* 108 F.Supp.2d 19, 28 (D.D.C.2000) (quoting *Public Citizen Health Research Group v. Food and Drug Administration,* 704 F.2d 1280, 1290 (D.C.Cir.1983)). Thus, requested information satisfies this prong of the exemption, "where the submitter [of the information] has a 'commercial interest' in the information." *Public Citizen,* 704 F.2d at 1290. "Examples of items generally regarded as commercial or financial information include: business sales statistics,

**10.** The parties concede that no trade secrets are involved in the instant matter. General Laws 1956 § 6–41–1(D) defines a trade secret as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

"(1) Derives independent economic value, actual or potential, from not being

generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

"(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

54

research data, technical designs, overhead and operating costs, and information on financial condition." *Landfair v. United States Department of the Army*, 645 F.Supp. 325, 327 (D.D.C.1986).

Given the broad definition of "commercial or financial" applied by the federal courts, it may well be true, as the motion justice ruled, that *all* the information requested by the Journal was "commercial or financial" in nature as required by § 38–2–2(4)(i)(B). Nevertheless, because the motion justice did not inspect all the documents requested and, because, for those documents that she did inspect, she limited her review to the documents as a whole and not to the various kinds of information contained within those documents, I would remand this case for a redetermination of whether *all* the information requested was in fact "commercial or financial" as defined above. Note that no matter how "commercial" or "financial" the information may be, if the requested information is submitted or generated by the governmental entity itself, then as discussed below, it should not be exempt from disclosure unless its nongovernmental source can be extrapolated from merely viewing the requested information.

2. *Is the Requested Information Obtained from a Person, Firm, or Corporation Other than the Governmental Agency Itself?*

Here is where I believe both the motion justice and the majority have strayed from the text of the exemption. Section 38–2–2(4)(i)(B) exempts only information that the government agency (in this case the Authority) "obtained from a person, firm, or corporation"—but *not* from the agency itself. In the context of FOIA's Exemption 4, the term "person," "applies to a wide range of entities, including corpora-

tions, associations and public or private organizations." *Judicial Watch*, 108 F.Supp.2d at 28 (citing *Allnet Communication Services, Inc. v. Federal Communications Commission*, 800 F.Supp. 984, 988 (D.C.Cir. 1992), *aff'd*, No. 92–5351, 1994 U.S.App. LEXIS 40831 (D.C.Cir. May 27, 1994)). "The only type of entity that is not considered a 'person' under Exemption 4 is an agency of the * * * government." *Id.* *See also Federal Open Market Committee*, 443 U.S. at 360, 99 S.Ct. at 2812, 61 L.Ed.2d at 603. However, information contained in documents and reports prepared by the government (and therefore not "obtained from a person") also may be covered by Exemption 4 if the information therein is deemed to be a summary or reformulation of information supplied by a source outside the government. *See Gulf & Western Industries, Inc. v. United States*, 615 F.2d 527, 529–30 (D.C.Cir. 1979).

The motion justice concluded that "[t]he documents that are submitted by persons seeking to utilize the Convention Center involve financial records * * * that people presume will be kept confidential when they are engaging in the negotiation process." What she failed to address, however, was whether *all* the documents and information that the Journal requested were "submitted by persons seeking to utilize the Convention Center." For example, the Journal requested only the Authority's negotiation documents reflecting communications "among hotel management, tournament officials and members of the Convention Center Authority and [S]tate Department of Economic Development." Such documents, to the extent they exist, would have been created by the Authority itself or by other government entities and may have included information that was not obtained from prospective

users of the Authority's facilities.[11] If so, then this information would not have been "submitted by persons seeking to utilize the Convention Center," as the motion justice believed—unless (and only to the extent) the documents containing this information revealed on their face that the commercial information contained therein had been supplied by a person or entity seeking to use the Authority's facilities. Although the motion justice determined that "there is an intricate connection between the documents that are submitted which resulted in the negotiations process and the financial document which is the contract with the negotiated rate that the Journal is seeking," it is unclear why or how this conclusory statement is true. Nor is it apparent how the rates, terms, and other information in the contract could be traced from the face of that document to any information provided by a person other than the Authority itself. Nevertheless, based on this asserted "intricate connection," the motion justice stated: "I don't think based upon how I had looked at these documents that it would be possible to separate out what [the Journal was] looking for without disclosing what the Court considers is protected under the Act." Implicit in her finding, however, is an assumption that all commercial information in the contracts for any of the events in question was exempt from disclosure. Yet contract documents and the financial information contained therein are not usually "obtained from a person, firm, or corporation;" rather, in most cases, they are the product or fruit of the parties' negotiations; thus, they are separate and distinct from any information that was "obtained from" some other entity. Thus, I would hold that, in most situations, contracts and the information contained therein would not be able to satisfy the "obtained from a person" requirement to qualify for the exemption.

The United States Court of Appeals for the District of Columbia (D.C.Circuit), in *Gulf & Western*, provided useful guidance to courts struggling to distinguish exempt from nonexempt information in requested government documents when it held that a reviewing board had correctly deleted portions from an agency report "which contained information [obtained from a person] or from which information [obtained from a person] could be extrapolated." *Gulf & Western*, 615 F.2d at 530. If a neutral reviewer of the government document in question cannot objectively extrapolate that the information therein was "obtained from a person" other than the government agency itself, then the information should be disclosed, however confidential or sensitive the Authority itself may deem such information. If it is possible to extrapolate information "obtained from a person," then only that information should be deemed exempt and the rest of the document, as redacted, should be disclosed.

The D.C. Circuit's approach—particularly the extrapolation test used in *Gulf & Western*—is a potentially useful way to distinguish between information in a government document that is "obtained from a [nongovernmental] person" and all other information in the document that should be disclosed upon request. *Id.* at 529.

11. This would include any information in the Authority's documents that indicates the discounts it offered for banquets and the number of complimentary rooms it provided or offered to provide to its customers for these events. The fact that the Authority's records and documents containing this information may have been made during or after negotiations with potential customers of the Authority's facilities is irrelevant. What matters is that the information in question was not "obtained from a [non-government] person, firm, or corporation." Therefore, it does not fall within this particular APRA exemption.

Therefore, I would hold that the motion justice erred by failing to consider whether each requested document "contained information [obtained from a nongovernmental entity] or from which information [obtained from a nongovernmental entity] could be extrapolated." *Id.* at 530. On the other hand, if information in the documents requested from the Authority was in fact obtained from a nongovernmental entity but does not, on its face, indicate the source of that information or otherwise provide a ready means to extrapolate that source, I would hold that the information should be disclosed.

Moreover, even if there were an intricate connection between the Authority's documents that refer to its contract negotiations for the events in question and the contracts themselves, and even if all the data in the contracts had been "obtained from a person" and, thus, qualified as exempt from disclosure, it would not necessarily mean that all negotiation-related documents themselves also were exempt. Although non-exempt *information* contained in a document may be exempt if it is "inextricably intertwined with exempt portions of a document," such inextricable intertwining between exempt and non-exempt *documents* does not necessarily create a blanket exemption for otherwise disclosable information within these documents. *Mead Data Central, Inc. v. United States Department of the Air Force,*

566 F.2d 242, 260 (D.C.Cir.1977); *Judicial Watch,* 108 F.Supp.2d at 31–32. The "focus of the FOIA is information, not documents, and an agency cannot justify withholding an entire document simply by showing that it contains some exempt material." *Mead Data Central, Inc.,* 566 F.2d at 260. FOIA, like APRA, requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt * * *." 5 U.S.C.A. § 552(b). Because APRA's exemptions must be narrowly construed, I believe that the motion justice should assess and make express findings on the question of whether non-exempt information reasonably can be segregated from exempt information within particular documents or categories of documents. *See Schiller v. NLRB,* 964 F.2d 1205, 1209–10 (D.C.Cir.1992) (holding that a district court clearly errs when it approves the government's withholding of information under FOIA without making an express finding on segregability).

Finally, both the motion justice and the majority have failed to address at all whether the operational data requested by the Journal (that is, the specific and general complimentary room, banquet discount, and profit-and-loss data) was information "obtained from a person," as required by § 38-2-2(4)(i)(B) for such information to be exempt.[12] It is hard to imagine how

---

**12.** The operational data requested by the Journal, included the following:

(1) Records pertaining to the Westin Hotel's hosting of the Mobil Celebrity Golf Invitational Tournament (held on August 3–6, 1995):
(a) The number of complimentary rooms provided for the tournament and the dollar value of those rooms.
(b) The ultimate profit/loss to the hotel from the event.

(2) Records pertaining to the Verrazano Day Banquet (held at the Convention Center on May 19, 1996):
(a) The number of people who attended the dinner and the total cost and per person cost to the Convention Center and to the banquet's organizers and attendees.
(b) The net profit/loss to the Convention Center for the event.
(3) The number of complimentary rooms the Westin Hotel has provided since it

the motion justice could have found *all* (or indeed, any) of this requested data to have been obtained from an entity other than from the Authority itself. If, as is likely, this requested information was not obtained from others, yet the Authority's records contain such information, then the exemption would not apply and at least those portions of records containing such information should be disclosed. In focusing solely on the contracts and the so-called negotiation documents, the Court, it seems to me, loses sight of this operational-data aspect of the Journal's APRA request. Moreover, it is no answer to this request for operational data to invoke the no-compilation requirement. If the requested information is in the Authority's records, it should be produced; if it is not there, however, then the Authority is not required to compile or to create it for the Journal.

Thus, I disagree with the majority's implicit but unstated holding that § 38–2–3(f) exempts from disclosure all the operational data requested by the Journal. Section 38–2–3(f) (as amended in P.L.1998, ch. 378, § 1) [13] provides that:

> "Nothing in this section [of APRA] shall be construed as requiring a public body

to reorganize, consolidate, or compile data not maintained by the public body in the form requested at the time the request to inspect the public records was made *except to the extent that such records are in an electronic format and the public body would not be unduly burdened in providing such data.*" (Emphasis added.)

Although it is true that § 38–2–3(f) would allow the Authority to deny a request by the Journal to compile data not previously maintained in the form requested, it does not necessarily follow, as the majority implicitly holds, that all the information that would have gone into the compilation would be exempt from disclosure. In fact, in addition to the "electronic format" exemption underscored above, § 38–2–3(e) (as amended in P.L.1998, ch. 378, § 1) [14] provides that

> "Any person or entity requesting copies of public records may elect to obtain them in any and all media in which the public agency is capable of providing them. *Any public body which maintains its records in a computer storage system shall provide any data properly identified in a printout or other reason-*

---

opened and the dates it provided those rooms and their dollar value.

(4) The number of banquets that have been held at the Convention Center since it has opened and the standard rate schedule. The number of banquets that have received discounts. The profits/loss of the banquets that received discounts.

**13.** In my opinion the 1998 amendments merely clarified legislative intent rather than effecting a substantive change in the legislation. *See Solas,* op. at 9, at ——, 2001 WL 674152. The language of § 38–2–3(f), as amended in 1984 (P.L.1984, ch. 372, § 2) and effective in 1996 and 1997, when the Convention Center denied both of the Journal's information requests, provided that:

"Nothing herein shall be construed as requiring a public body to reorganize, consolidate, or compile data not maintained by the public body in the form requested at the time the request to inspect such public records was made."

**14.** In my opinion the 1998 amendments merely clarified legislative intent rather than effecting a substantive change in the legislation. *See Solas,* op. at 9, at ——, 2001 WL 674152. The language of § 38–2–3(e), as amended in 1984 (P.L.1984, ch. 372, § 2) and effective in 1996 and 1997, when the Convention Center denied both of the Journal's information requests, provided that:

"Any public body which maintains its records in a computer storage system shall provide a printout of any data properly identified."

*able format, as requested.*" (Emphasis added.)

Therefore, even in the unlikely event that the Authority has not produced reports compiling or summarizing the operational data requested by the Journal, the Journal would be within its right under § 38–2–3(e) to request all of the raw data from any computer-storage system that could generate such a report.

The Superior Court was faced with a very similar situation in *Providence Journal Co. v. Pine,* No. C.A. 96–6274, 1998 WL 356904, at *17–18 (R.I.Super. June 24, 1998). In that case, the court held that "[f]or purposes of conforming with the Journal's modified request, it is entirely up to the Attorney General whether he chooses to manually redact material or whether he prefers to prepare a computer program in order to accomplish the same end result; however, the fact that the Attorney General may have to reprogram the computer will not serve as a bar to providing accessible gun permit records." *Id.* at *18. Additionally, in *Disabled Officer's Association v. Rumsfeld,* 428 F.Supp. 454, 457 (D.D.C. 1977), the United States District Court stated that "had plaintiff requested the files and records * * * with all the information deleted save [the requested information], this request would clearly be one for existing records; that plaintiff phrased its request in a somewhat different form does not affect the substance of the request." In interpreting *Rumsfeld,* the Comment section of the Uniform Information Practices Code (U.L.A.) § 2–102 noted that:

> "As a general rule, [§ 38–2–3(f) ] should be invoked selectively because the requester has the option of having the full record system duplicated. * * * If that option is taken, the agency under [§ 38–2–2(4)(ii) ] would have the burden of screening all records for non-disclosable material. The costs of duplication, while imposing, might not be great enough to discourage the requester. Thus the agency might find it easier to produce the compilation than to screen the records from which the compilation would have to be derived." Unif. Info. Practices Code § 2–102, cmt. background, 13 U.L.A. 286 (1986).

Therefore, in remanding this case to the Superior Court, I would instruct that court to ascertain from the parties whether documents containing or referring to any of the requested operational data exist (for example, documents referencing the complimentary rooms provided, the banquet discounts given, and profit and loss data for events) and, if not, give the Journal the option to obtain such information via § 38–2–3(e).

By enacting G.L.1956 § 42–99–17, the General Assembly specifically decided to subject the Authority to APRA. Therefore, neither the motion justice nor this Court should carve out for the Authority a judicially created exemption from APRA for the Authority's own commercially sensitive records—unless the exemption requirements of § 38–2–2(4)(i)(B) have been satisfied. If the General Assembly had wanted to eliminate the "obtained from a person" requirement for the Authority's own confidential commercial information, it would have passed legislation creating such a special exception. Congress did exactly that for the United States Post Office when it passed the Postal Reorganization Act. That act allowed the Postal Service to withhold from a FOIA request "information of a commercial nature, including trade secrets, *whether or not obtained from a person* outside the Postal Service, which under good business practice would not be publicly disclosed." 39 U.S.C.A. § 410(c)(2) (West 1980). *See also Piper & Marbury, L.L.P.,* 2001 WL 214217 at *3.

As long as there is no such special exception for the Authority's own commercial and financial information—no matter how confidential and commercially sensitive the Authority may deem such data—courts should examine strictly *all* information requested under APRA and deny exemption requests for any information that has not been "obtained from a person" but simply created by the governmental entity itself. Therefore, rather than endeavoring to guess at the motion justice's reasoning—and rather than ruling ourselves on the various requests based upon documents and information that are not properly before us—I would remand this case to the Superior Court for a reconsideration of the motion consistent with the above-referenced analysis.

3. *Is the Information Requested Commercially Privileged or Confidential?*

The motion justice was on the right track when she observed, "[this] is a very broad claim of privilege and confidentiality" that the Authority invoked, especially when she asked "is there any reason why we can't block out identifying information and just let the financial information be disclosed?" Unfortunately, she failed to pursue this line of inquiry and reasoning. Instead, she issued a blanket ruling that *all* "these records are not subject to disclosure because they're confidential." Because at least *some* of the requested information was not "obtained from a person," the motion justice did not even need to reach the question of whether it was "privileged or confidential." This is so because, under APRA's § 38–2–2(4)(i)(B), "privileged or confidential" information obtained from the government itself (as opposed to a nongovernmental person) is not exempt from disclosure. Thus, the information requested not only must be "commercial or financial" in nature, but also "obtained from a person," *and* "privileged or confi-

dential" to be exempt from disclosure under § 38–2–2(4)(i)(B).

Because it is unclear exactly what standards the motion justice used to conclude that *all* the information requested was "privileged or confidential," and because the motion justice herself asked "[i]s 'privilege' and 'confidential' defined somewhere in the statute itself?", I would remand this case for a redetermination of this aspect of the exemption based on the definitions provided below.

For purposes of determining whether commercial information is "privileged or confidential" under § 38–2–2(4)(i)(B), we should follow, as have numerous other courts in construing FOIA's Exemption 4, the two-pronged test announced in *National Parks and Conservation Association v. Morton*, 498 F.2d 765, 770 (D.C.Cir. 1974). *See, e.g., Orion Research, Inc. v. E.P.A.*, 615 F.2d 551 (1st Cir.), cert. denied, 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980); *American Airlines v. National Mediation Board*, 588 F.2d 863 (2d Cir.1978); *Westinghouse Electric Corp. v. Schlesinger*, 542 F.2d 1190 (4th Cir. 1976), cert. denied, 431 U.S. 924, 97 S.Ct. 2199, 53 L.Ed.2d 239 (1977); *Continental Oil Co. v. F.P.C.*, 519 F.2d 31 (5th Cir. 1975), cert. denied, 425 U.S. 971, 96 S.Ct. 2168, 48 L.Ed.2d 794 (1976). In *National Parks*, the D.C. Circuit held that, even if the requested commercial or financial information was not of the type that would customarily be released to the public by the person from whom it was obtained, it still should not be deemed confidential—unless it could also be shown that "nondisclosure is justified by the legislative purpose which underlies the exemption." *National Parks*, 498 F.2d at 767. Examining the legislative history of this exemption, that court found that Congress had intended the exemption to "encourage[ ] cooperation with the Government by per-

sons having information useful to officials," and to "protects persons who submit financial or commercial data to government agencies from the competitive disadvantages which would result from its publication." *Id.* at 768. Therefore, the court held, a "commercial or financial matter is confidential for purposes of the exemption if disclosure of the information is likely to have either of the following effects: (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." *Id.* at 770. The court "express[ed] no opinion as to whether other governmental interests [like compliance or program effectiveness were] embodied in this exemption." *Id.* at 770 n. 17.[15]

But I do not believe that we should broaden the General Assembly's definition of "confidential" to include information that, if released, might tend to compromise a government interest in efficiency and effectiveness. Such a broad definition would not be one derived from the text of the statute and would be at odds with the overriding purpose of APRA to facilitate public access to public records. Moreover,

as a practical matter, it would serve as a poor substitute for the General Assembly's policy decision concerning which government agencies require such extraordinary protection. Rather than allowing *all* government agencies to escape APRA's disclosure requirements merely by convincing a court that their commercial and competitive operations would somehow be more efficient or effective if certain information were exempt from disclosure, we should defer to the General Assembly, which is far better equipped to make such difficult policy decisions, to decide which specific agencies or government entities require broader protection from APRA-mandated disclosures. Although the D.C. Circuit acknowledged that "the two interests identified in the *National Parks* test are not exclusive," it declined to follow the First Circuit and has yet to "offer [an] opinion as to whether any other governmental [that is, any governmental interest in administrative efficiency and effectiveness] or private interest might also fall within the exemption's protection." *Critical Mass Energy Project v. Nuclear Regulatory Commission,* 975 F.2d 871, 879 (D.C.Cir.1992).[16]

---

**15.** The First Circuit, however, in *9 to 5 Organization for Women Office Workers v. Board of Governors of the Federal Reserve System,* 721 F.2d 1, 11 (1st Cir.1983), accorded a broad construction to the FOIA definition of "confidential" by holding that "[i]n view of the legitimate governmental interest of efficient operation, it would do violence to the statutory purpose of [E]xemption 4 were the Government to be disadvantaged by disclosing information which serves a valuable purpose and is useful for the effective execution of its statutory responsibilities." Likewise, the District Court for the District of Columbia in *Judicial Watch, Inc. v. Export–Import Bank,* 108 F.Supp.2d 19, 30 (D.D.C.2000), held that "impairment of an agency's ability to carry out its statutory purpose is sufficient cause to justify a finding of confidentiality within the context of Exemption 4."

**16.** In *Critical Mass Energy Project v. Nuclear Regulatory Commission,* 975 F.2d 871 (D.C.Cir.1992), the D.C. Circuit reaffirmed the two-pronged test it earlier had established in *National Parks and Conservation Association v. Morton,* 498 F.2d 765 (D.C.Cir.1974), but it limited its application "to the category of cases to which it was first applied; namely, those in which a FOIA request is made for financial or commercial information a person was *obliged* to furnish the Government." 975 F.2d at 880. (Emphasis added.) For information *voluntarily* provided to the Government on a confidential basis, it held that "Exemption 4 protects any financial or commercial information provided to the Government on a *voluntary* basis if it is of a kind that the provider would not customarily release to the public." *Id.* (Emphasis added.) The court eliminated the additional two-pronged legisla-

It is unclear from the record before us exactly which of the above-stated definitions of "privileged or confidential" the motion justice relied upon. For at least some of the information, if not all, the motion justice agreed with the Authority that the information was voluntarily "obtained from a person" and therefore, that it was confidential under *Critical Mass.* Yet the record also indicates that the motion justice ruled that at least some requested information was confidential because, if it were released, it would harm *the Authority's* ability to compete against other convention centers, banquet halls, and hotels. But this definition of "confidential" is not consistent with either *National Parks* or *Critical Mass,* let alone with APRA. *National Parks* holds that information may be deemed confidential if its disclosure would "cause substantial harm *to the competitive position of the person from whom the information was obtained* "—but not merely to the competitive position of the government agency that obtains it. 498 F.2d at 770. (Emphasis added.) This, too, is the same analysis that should be applied to this APRA exemption.

### Conclusion

Rather than guessing at the motion justice's reasoning vis-à-vis specific documents and requested information—or ruling ourselves based upon documents and information that are not before us—I would vacate the Superior Court's grant of summary judgment and remand this case to that court for a reconsideration of the motion in light of the principles discussed above. Thus, I concur with respect to the Court's decision to do so with respect to the contracts at issue, but I would go further and have the Superior Court take a second look at all the requested information in light of the analysis set forth herein. Obviously, that court would remain free to redetermine whether § 38–2–2(4)(i)(B) exempts some or all the requested information from APRA, but I would order it to reconsider the motion and issue a new decision in accordance with the preceding analysis of the issues presented for decision in applying this APRA exemption. Obviously, to the extent any disputed issues of material fact may arise, the motion should be denied and the case should proceed to trial. Also, to facilitate our review on any future appeal, I would order the Superior Court to place copies of any exempted documents (or at least a representative sample thereof) under seal so that we can conduct an informal review of their exempt status on appeal.

tive-purpose test by finding that "[i]t is a matter of common sense that the disclosure of information the Government has secured from voluntary sources on a confidential basis will both jeopardize its continuing ability to secure such data on a cooperative basis and injure the provider's interest in preventing its unauthorized release." *Id.* at 879. Although I agree with the D.C. Circuit that, if the government is forced to reveal such information, nongovernmental parties may be less likely to voluntarily offer information to the government in the future, I would stop short of assuming that this is always the case and hold rather that the exemption creates a rebuttable presumption in favor of not disclosing such information. Thus, if a person provides commercial or financial information to a government agency voluntarily, the government agency would enjoy a rebuttable presumption that such information is confidential, assuming that it is the "kind that the provider would not customarily release to the public." *Id.* at 880. But such a presumption could be rebutted by the requesting party by showing, for example, that the provider has customarily released such information to the public.